IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | : CASE NO. 4: 02 CR 8 |
| Plaintiff | : |
| | : MEMORANDUM OF OPINION AND |
| -vs- | : ORDER |
| DAVID J. HOLDEN | : |
| Defendant | : |

UNITED STATES DISTRICT JUDGE LESLEY WELLS

On 23 June 2005, this Court held an evidentiary hearing on Lawrence Holden's[1] petition, asserted individually and as executor of Alice Holden's estate, claiming a legal interest in a particular piece of real property which was the subject of a preliminary forfeiture order. Because, as outlined below, Lawrence Holden has failed to meet the requisite burden for setting aside a forfeiture order, his petition will be dismissed.

## I. BACKGROUND

**A.   Forfeiture Proceedings**

This forfeiture action arose as an ancillary proceeding in the criminal prosecution of David J. Holden. On 9 January 2002, defendant David J. Holden was indicted in a single

---

[1] The petition was initially filed by both Lawrence Holden and Alice Holden. However, since the petition was filed, Alice Holden passed away and Lawrence Holden was appointed as the executor of her estate. Accordingly, Lawrence Holden is now pursuing this action both individually and as executor of Alice Holden's estate.

count of a four-count indictment. Count one charged him, along with his co-defendants Barbara Woods and Otis Woods, Jr., with conspiracy to distribute and to possess with intent to distribute more than 5 kilograms of cocaine. (Docket #1). David Holden ultimately pled guilty to count one and was sentenced to 92 months in prison. Pursuant to the terms of his plea agreement, David Holden agreed to forfeit all of his right, title, and interest in 28 items including cash, weapons, vehicles, and real property located at 100 Creed Circle, Campbell, Ohio, Permanent Parcel No. 4601 900 26010 ("Creed Circle property"). (Docket #48, at 8-15). In his plea agreement, David Holden admitted that all of the forfeited items, including the Creed Circle property:

> [C]onstitute or were derived from proceeds he obtained directly or indirectly as a result of the violations pled to above; or were used or intended to be used in any manner or part to commit and to facilitate the commission of the said violation.

(Docket #48, at 14).

On 19 June 2002, the United States filed a motion for a preliminary order of forfeiture as to the 28 assets set forth in the plea agreement. (Docket #52). On 6 August 2002, this Court issued a preliminary order of forfeiture with respect to all 28 assets and an order accepting Alice and Lawrence Holden's – David Holden's mother and brother – prematurely filed petition for consideration.[2] (Docket #61 and #62). In their petition, the Lawrence and Alice Holden claimed a legal interest in 22 of the forfeited assets. (Docket #54). On 19 April 2004, the parties filed a joint motion for a final order of forfeiture as to all assets except the Creed Circle property, and this Court entered the final order of forfeiture

---

[2] The Holden's petition was initially filed on 12 July 2002.

as to those assets that same day.  (Docket #108).

Accordingly, the only property which remains in dispute is the Creed Circle property.  On 17 June 2005, both parties filed legal briefs regarding the petitioners' legal interest, or lack thereof, in the Creed Circle property.  (Docket #118 and #119).  This Court held an evidentiary hearing on the petition on 23 June 2005.[3]

**B.    Creed Circle Property**

David Holden purchased the Creed Circle property from Anthony, Henry, and Guy Paul Gaetano for $18,000.  After the property was transferred to David Holden on 1 June 1995., construction began on a home which was completed in the Spring of 1996.  David Holden lived at the residence until his arrest on 11 January 2002.[4]  Holding the deeds to the Creed Circle property since he first acquired it, David Holden remains its sole owner of record.  A 28 January 2004 appraisal valued the residence at $213,000.

Although neither Lawrence nor Alice Holden ever held legal title to the Creed Circle property, Lawrence Holden testified at the evidentiary hearing that David, Alice, and himself planned to purchase the property and build the house together and that the property was supposed to be in all three names.  He testified that he and his mother contributed $21,000 for the purchase of the property[5] and approximately $107,000

---

[3] The long delay in resolving Alice and Lawrence Holden's petition was occasioned by what can only be described as a surreal chain of events consisting of changes in petitioners' counsel, protracted settlement discussions, the death of one of the petitioners, and counsel's health problems and family medical emergencies.

[4] A search executed at the Creed Circle property turned up $453,000 in cash and numerous firearms.

[5] Although he had never seen the settlement statement and was not directly involved in the purchase, Lawrence Holden testified that he believed the purchase price of the property was $28,000.

3

towards the construction of the home.[6] Testifying that everything was paid for in cash, Lawrence Holden explained that he had been unable to locate any receipts since the Creed Circle property was searched and his brother was arrested. Lawrence Holden further claims that he put "sweat equity" into the home both during and after its construction and that he has paid the taxes, utilities, and miscellaneous home expenses since David Holden has been in prison.

## II. ANALYSIS

Title 21 provides that anyone convicted of a federal drug felony forfeits to the United States any property "constituting, or derived from, any proceeds" obtained as a result of the crime and any property "used, or intended to be used . . . to commit, or to facilitate the commission of" the crime. 21 U.S.C. § 853(a)(1) and (2); see also United States v. Pease, 331 F.3d 809, 810 (11th Cir. 2003). All rights, title, and interest in such property "vests in the United States upon the commission of the act giving rise to [the] forfeiture." 21 U.S.C. § 853(c). Although Section 853 constitutes a mandatory forfeiture scheme, "it only entitles the government to forfeiture of a convicted defendant's interests and nothing more." United States v. O'Dell, 247 F.3d 655, 679-80 (6th Cir. 2001). The government "merely steps into the shoes" of the criminal defendant. Id. at 685.

Pursuant to Section 853(n)(2), third parties asserting a legal interest in the property may petition the court for a hearing to resolve the "validity of [the] alleged interest in the

---

[6] Lawrence Holden testified that the construction of the home, excluding the purchase of land, cost $156,000. According to Lawrence Holden, David Holden also paid about $50,000 for the construction of the home.

4

property." To successfully set aside the forfeiture of properties of a criminal defendant, petitioners must show, by a preponderance of the evidence, either that they possess a vested legal right, title, or interest in the subject property which was superior to any right, title, or interest the defendant may have possessed at the time he or she committed the offense giving rise to the forfeiture, or that they were bona fide purchasers for value. 21 U.S.C. § 853(n)(6)(A) and (B); *see also* United States v. Campos, 859 F.2d 133, 1235 n.3 (6th Cir. 1988); Pease, 331 F.3d at 810. In determining the legal rights of the parties in particular property, courts must look to state property law. United States v. Harris, 246 F.3d 566, 571 (6th Cir. 2001) (explaining that "it is appropriate to refer to state law in determining the nature of the property interest involved in a forfeiture proceeding").

Although the basis for the petitioners' claim to the Creed Circle property is somewhat nebulous, their argument rests on considerations of equity. At the hearing, Lawrence Holden testified that he, Alice, and David were "going in to buy the [Creed Circle] property and put up a house," that all three made relatively equivalent financial contributions, and that it was "supposed to be in all three names." (Tr. at 23-25). By virtue of their financial investment and Lawrence's Holden's "sweat equity," the petitioners suggest that they have acquired a legal interest in the property which exceeded that held by David Holden during the time in which he participated in the drug conspiracy. In assessing the merits of this argument, this Court turns to Ohio law.

As an initial matter, this Court notes that the petitioners concede that David Holden has title to the property and that "absolute ownership . . . is vested in David Holden." (Docket #119, at 3). This concession is consistent with Ohio law which provides that "[t]o

5

be the owner of *real* property, the person must hold legal title to the property, not simply an equitable interest in the property." Victoria Plaza Ltd. Liab. Co. v. Cuyahoga Cty. Bd. of Revision, 86 Ohio St. 3d 181, 183 (1999).

Accordingly, the petitioners' claim to the property rests solely on a purported oral agreement by which Lawrence and Alice Holden were to receive equal interests in the Creed Circle property in return for their financial contributions, an agreement which David Holden purportedly breached by placing the property in his name alone.  Assuming, without deciding, that a claim of that nature could ever meet the requirements necessary to set aside a forfeiture of real property, such a claim faces significant hurdles, which, in this case, are insurmountable.

In Ohio, agreements to transfer interests in real estate generally fall within the statute of frauds, and therefore must be memorialized in writing.  O.R.C. §§ 1335.04 and 1335.05.  Given the lack of any written agreement memorializing Alice and Lawrence Holden's alleged interest in the property, the petitioners' purported oral agreement lacks legal force and effect unless the agreement is taken out of the statute of frauds.  Under Ohio law, equity may afford relief from the strict application of the statute of frauds pursuant to the doctrine of part performance.  Tier v. Singrey, 154 Ohio St. 521, 526 (1951).  To be sufficient to remove an agreement from the operation of the statute of frauds, part performance must consist of "unequivocal acts by the party relying on the agreement, which are exclusively referable to the agreement, and which have changed his position to his detriment and make it impossible or impractical to place the parties *in statu quo*." Delfino v. Paul Davies Chevrolet, Inc., 2 Ohio St.2d 282, 287 (1965); see also Beaverpark

Assoc. v. Larry Stein Realty Co., 1995 WL 516469, *3 (Ohio Ct. App. Aug. 30, 1995).

Although part performance, as an equitable doctrine, turns largely on the circumstances of each particular case, a party may generally only rely on that doctrine if they can demonstrate "the delivery of possession and other facts which indicate the existence of a contract" as well as detrimental reliance.  See e.g. Brennan v. Fowler, 100 Ohio App. 3d 577, 584 (1995).  Ohio courts generally consider the following factors to be relevant in determining the applicability of the part performance doctrine: 1) evidence of a change in possession; 2) payment of all or part of the consideration for the land; and, 3) improvements, alterations or repairs upon the land by the possessor.  Geiger v. Geiger, 1993 WL 476247, *4 (Ohio Ct. App. Nov. 16, 1993); Brown v. Brown, 2005 WL 914490, *3 (Ohio Ct. App. Apr. 14, 2005).  Neither mere possession of the real property, nor payment of consideration are by themselves sufficient to avoid the applicability of the statute of frauds.  Tier, 154 Ohio St. at 526 Snyder v. Warde, 151 Ohio St. 3d 426, 434 (1949); Crabill v. Marsh, 38 Ohio St. 331, 338 (1882); Easterling v. Easterling, 1998 WL 958308, at *2 (Ohio App. Ct. May 29, 1998).

In this case, the petitioners cannot rely on the part performance doctrine to escape the statute of frauds because they did not reside in or possess the property during the relevant time period and because they have failed to produce credible evidence of their alleged payments and the agreement itself.  Besides being the sole owner of record for the Creed Circle property, David Holden was the only individual who lived at the Creed Circle residence from the time the property was purchased until his arrest in 2002.  Although Lawrence Holden initially testified that he lived at the Creed Circle property since 1995,

7

"[s]ince it was built," (Tr. at 17),[7] it quickly became apparent that such statements did not accurately portray his situation. After being impeached on cross-examination with his prior deposition testimony,[8] Lawrence Holden ultimately admitted that, except for perhaps a very

---

[7] Lawrence Holden reiterated this in response to further questioning by his attorney:

Q: Now, did you live anywhere else than the creek circle address from 1996 until the day of your brother's arrest?

A: No.

Q: After your brother was arrested, you continued to live there?

A: Yes.

(Tr. at 28).

[8] The following exchange was taken from Lawrence Holden's 29 October 2002 deposition, with AUSA Villa asking the questions:

Q: You recently moved back to the Campbell house [Creed Circle property]; is that right?

A: Yes.

Q: When did you move back?

A: After that January 9th when they picked David up, that's when I moved back with her.

Q: Did your mother move into the house with you?

A: Yes, sir.

Q: Okay. So since January 9th?

A: Yes.

* * *

Q: But your – I'm trying to understand that. But before David was arrested, who lived in [the Campbell] house, who lived in that house?

A: Before he was arrested?

Q: Yes

8

brief time in 1996, neither he nor his mother resided at the Creed Circle property until after David Holden was arrested.[9]

---

| | | |
|---|---|---|
| A: | | He was there. |
| Q: | | And who lived there with him? |
| A: | | He was there by hisself. |
| Q: | | By himself? |
| A: | | Right. |
| Q: | | So you didn't live there? |
| A: | | No, we wasn't there. |
| Q: | | And your mother didn't live there? |
| A: | | No. |

(Tr. at 45-46).

[9] When first confronted with the inconsistency between his deposition and hearing testimony by the Court, Lawrence Holden initially reiterated that he had lived in the home since it was built and that what he said at his deposition was not true. He eventually recanted that story on redirect:

> Q: Prior to 2002, your brother's arrest, your mother and you were not in the home on creed.
>
> A: No.
>
> * * *
>
> Q: Now, when did you – you stated on the record that you lived at creed circle since the home was built in 1996.
>
> A: Yes.
>
> Q: When did your mother have the stroke?
>
> A: My mom had the stroke in early – early January.
>
> Q: Okay. So –
>
> A: She was hospitalized for awhile.
>
> Q: You never lived at creed circle?
>
> A: We lived there, it wasn't long, but we lived there.

9

Besides making clear that the petitioners did not possess the Creed Circle property during the pertinent time period, Lawrence Holden's misleading and/or untruthful testimony concerning their residence eviscerated the credibility of his testimony which was the linchpin to the petitioners' claim. Lawrence Holden's testimony constitutes the sole evidence regarding the alleged agreement between Alice, Lawrence, and David Holden to pool their funds, purchase the Creed Circle property, and own it collectively. Likewise, as the petitioners have presented no documentary evidence suggesting they paid anything towards the purchase of the property or the construction of the home, Lawrence Holden's testimony offers the only possible support for their purported financial expenditures on the Creed Circle property. As this Court finds Lawrence Holden's testimony to be completely lacking in credibility, such evidence is insufficient to establish the existence of any oral agreement between the Holdens or to prove that Lawrence or Alice Holden paid over $100,000 toward the purchase of the Creed Circle property and construction of the house. Even if this Court were to credit Lawrence Holden's testimony about petitioners financial involvement in the Creed Circle property, payment of consideration, as noted above, is not enough to support the application of the part performance doctrine.

In short, the Holdens have failed to demonstrate, by a preponderance of the

---

Q: And then you moved out?

A: Right. Exactly right.

Q: And you didn't move back in until afterwards?

A: After, exactly.

(Tr. at 49-50).

evidence, any vested legal interest, right, or title in the Creed Circle property, let alone one that was superior to David Holden's interest during the relevant time period. Since the Creed Circle property was purchased in 1995, David Holden has been the sole owner of record. Moreover, once the home was constructed on the Creed Circle property, David Holden was the only individual residing there until his arrest in 2002. Although Lawrence Holden testified about an oral agreement that he and his mother were to jointly own the Creed Circle property with David Holden, he has presented no credible evidence of such an agreement. Even if there were some credible evidence of an oral agreement, that agreement would lack legal effect due to Ohio's statute of frauds. Accordingly, the petition to set aside the forfeiture of the Creed Circle property lacks merit.

### III. CONCLUSION

For the reasons set forth above, this Court dismisses Lawrence Holden's petition, asserted individually and as executor of the estate of Alice Holden, claiming a legal interest in the Creed Circle property.

IT IS SO ORDERED.

    /s/Lesley Wells
UNITED STATES DISTRICT JUDGE

Dated: 7 July 2005

11